United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICK BRENNAN, ET AL.,

        Plaintiffs,

    v.

COUNTY OF CONTRA COSTA, ET AL.,

        Defendants.

_____/

Case No. C-08-05360 JCS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
ADJUDICATION AND DENYING
DEFENDANTS' MOTION TO STRIKE
STATEMENTS MADE IN PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
ADJUDICATION [Docket Nos. 42, 53]**

**I.      INTRODUCTION**

      This civil rights action arises from the shooting death of Decedent James Brennan and involves allegations that officers of the Contra Costa County Sheriff's Office violated Decedent's and Plaintiff Matt Brennan's constitutional right to be free from excessive force.  Defendants bring a Motion for Summary Adjudication ("Motion") and a Motion to Strike Statements Made in Plaintiffs' Opposition to Defendants' Motion for Summary Adjudication ("Motion to Strike").  All parties have consented to the jurisdiction of a United States magistrate judge, pursuant to 28 U.S.C. § 636(c).  On Friday, April 2, 2010, a hearing on the motions was held.  For the reasons stated below, Defendants' Motion for Summary Adjudication is GRANTED and Defendants' Motion to Strike is DENIED.

**II.     BACKGROUND**

    **A.     Facts**

        **1.      Events Leading up to Encounter Between Decedent and Deputy Ian Jones**

      According to Lieutenant Richard J. Marchoke, a police officer with the City of Antioch Police Department, Lt. Marchoke and Decedent attended a banquet at the Lone Tree Golf Course in Antioch on October 27, 2007 at approximately 7:00 p.m.  Declaration of Noah G. Blechman in

United States District Court

For the Northern District of California

1  Support of Defendants' Motion for Summary Adjudication ("Blechman Decl."), Ex. A (Declaration

2  of Lieutenant Richard J. Marchoke) ¶ 1-2.  Lt. Marchoke claims Decedent was "behaving strangely,"

3  "moving from table to table, glaring at other attendees in an intimidating manner."  *Id.* ¶ 3.  Lt.

4  Marchoke observed Decedent drinking alcohol at the banquet.  *Id.* ¶ 4.  Lt. Marchoke also states that

5  Decedent had challenged one attendee to fight and threatened to kill another.  *Id.* ¶ 3.  At the request

6  of another attendee, Lt. Marchoke and others asked Decedent to leave the banquet due to his

7  "threatening and belligerent behavior."  *Id.*  ¶ 5.  After being asked to leave for behaving

8  inappropriately, Decedent left the event.  *Id.* ¶ 6.  Lt. Marchoke states that because of Decedent's

9  behavior at the banquet, he contacted Antioch Police Department Sergeant Scott Freier and

10  requested a drive-through in case Decedent caused any further problems.  *Id.* ¶ 7.  Sergeant Freier

11  and Officer Robert Meads arrived a short time later and did not see anyone matching Decedent's

12  description.  *Id.*

13         Later that night, at approximately 11:00 p.m., Joshua Mullins was at the Trinity Day Spa at

14  5887 Lone Tree Way, Antioch.  Blechman Decl., Ex. B (Declaration of Joshua Mullins ("Mullins

15  Decl.")) ¶ 1.  Mullins was with his mother, who owns the business, and his fiancee.  *Id.*  The spa was

16  no longer open for business but the front door was unlocked.  *Id.* ¶ 1-2.  According to Mullins, he

17  was sitting at the front reception counter while his mother and fiancee were in the back room when

18  an unknown white male entered the business and approached the counter.  *Id.* ¶ 2.  Mullins describes

19  the man as in his mid to late forties, between 5'11" and 6' tall, and approximately 250 pounds,

20  wearing a baseball cap, sunglasses and a t-shirt.  *Id.*; Blechman Decl., Ex. C (Declaration of Officer

21  Meads in Support of Defendants' Motion for Summary Adjudication ("Meads Decl.")) ¶ 2.  Mullins

22  asserts that he later learned that the man was Decedent.  Mullins Decl. ¶ 8.

23         According to Mullins, he told the man that the business was closed and the man responded,

24  "Tell your dad he is a pussy," and, "I bet you are a pussy just like your dad is."  *Id.* ¶ 3-4.  When

25  Mullins asked the man to leave, the man continued to call Mullins and his father names including

26  "pussy" and "cunt."  *Id.* ¶ 5.  While Mullins states that he felt the man was trying to provoke a fight,

27  the man was not physically aggressive but was verbally threatening and acting strangely.  *Id.*

28  Mullins states that the man then walked toward the exit, stopped, looked back and said, "Tell your

United States District Court

For the Northern District of California

1    dad he is dead, and so are you!  I mean it, from Jim."  *Id.* ¶ 8.  The man then turned around and

2    walked quickly out the door.  *Id.*

3         Mullins described the vehicle the man was driving as a silver or gold Dodge Caravan

4    minivan, approximately a year 2000 model, with a noticeable dent to the rear of the driver's side.

5    Meads Decl. ¶ 8.  Mullins contacted the Antioch Police Department and Officer Meads was

6    dispatched to Trinity Day Spa.  *Id.* ¶ 2.  Based on Mullins' description of the man at the spa and the

7    post-shooting description of Decedent and the vehicle he was driving, Officer Meads believes the

8    man Mullins encountered was Decedent.  *Id.* ¶ 4.

9         Alejandro Martinez also claims to have encountered Decedent that night at the Broken

10   Wheel Bar in Oakley.  Blechman Decl., Ex. D (Declaration of Alejandro Martinez ("Martinez

11   Decl.")) ¶ 1, 3-4.  Martinez was working as a security guard at the bar on the night of October 27.

12   *Id.* ¶ 1.  Shortly before midnight, Martinez was asked by the owner of the bar to escort a patron

13   outside who was causing a disturbance inside the bar.  *Id.* ¶ 2.  According to Martinez, he saw two

14   white males arguing inside the bar and one of them, approximately 45 to 50 years old, tall, and

15   heavy set, was cursing and yelling at the other man.  *Id.*  Martinez later identified this man as

16   Decedent.  *Id.* ¶ 9; Blechman Decl., Ex. E (Declaration of Det. Schiro in Support of Defendants'

17   Motion for Summary Adjudication ("Schiro Decl.")) ¶ 4.  After identifying himself and asking

18   Decedent to leave, Martinez touched Decedent's arm and escorted him outside.  Martinez Decl. ¶ 3.

19        Martinez states that once Decedent was outside he began yelling and cursing at Martinez and

20   at a group of people walking by the bar.  *Id.* ¶ 4.  A man from the group punched Decedent in the

21   face, causing Decedent to fall on his back, and the group then started to kick and hit Decedent on the

22   ground until Martinez broke up the fight.  *Id.*  Martinez states that Decedent then got up and said

23   something to the effect of, "You wait, I'll be back for you."  *Id.* ¶ 5.  As Decedent walked toward his

24   vehicle, Martinez noted the license plate number.  *Id.* ¶ 6.  Martinez asserts that he heard Decedent

25   crash his vehicle into another vehicle in the parking lot but could not see the crash, then heard

26   Decedent's vehicle accelerate, heard the tires screech, and saw Decedent's vehicle come toward the

27   front of the bar and crash into a second vehicle in the parking lot.  *Id.*  Decedent then drove away

28   without stopping.  *Id.*

United States District Court

For the Northern District of California

Martinez gave Decedent's license plate number to the bar owner who called the police.  *Id.* ¶ 7.  The license plate number identified by Martinez matched the license plate number of the van found at the scene where Decedent was shot.  Schiro Decl. ¶ 5.  Two days later, on October 29, 2007, Detective Garrett Schiro of the Contra Costa County Sheriff's Office showed Martinez a DMV photograph of Decedent, and Martinez identified Decedent as the man who caused the disturbance at the Broken Wheel Bar on October 27.  *Id.* ¶ 3-4.

According to Decedent's son, Matthew Brennan, Decedent went to Matthew's house on the night of the shooting between 11:00 p.m. and 12:00 a.m.  Blechman Decl., Ex. F (Deposition of Matthew Brennan ("M. Brennan Depo.")) at 83.  Matthew states that Decedent appeared to have been beaten up: Decedent had blood dripping from his mouth, had a lump on his forehead, and his shirt was ripped on one side.  *Id.* at 83, 86.  Decedent told Matthew that he had been beaten up at the Broken Wheel Bar and that he was angry and wanted to shoot someone.  *Id.* at 83.  Specifically, Decedent said, "I want to kill these cocksuckers, those Mexican gangsters," and asked Matthew for a gun.  *Id.* at 87.  While Decedent appeared to have been drinking, Matthew states that he was not sure whether Decedent was drunk because Decedent had just been in a fight and might have been acting unusually as a result of the fight.  *Id.* at 85-86.  Matthew told Decedent that he did not have a gun, asked Decedent about what happened, and tried to calm Decedent down.  *Id.* at 78, 87, 89.  Matthew states that he is not sure whether he did have a gun at his house at the time.  *Id.* at 78.

According to Matthew, he spoke to Decedent for about three minutes before Decedent got into his car and left.  *Id.* at 89.  When Decedent left, Matthew was worried that Decedent would continue trying to get a gun or that he would go back to the bar and get into a fight.  *Id.*  Because Matthew's mother has a safe with guns inside at her house, Matthew thought Decedent would go there next to try to get a gun.  *Id.* at 90.  Matthew then called his brother, Theodore Brennan, and told him that Decedent had been beaten up and was heading to their mother's house to try to get a gun to use to shoot the people who had beaten him up.  *Id.*  Matthew told Theodore to go to their mother's house so that he would be there when Decedent arrived.  *Id.*

United States District Court

For the Northern District of California

Matthew and Theodore acknowledged that Decedent was thought to be bipolar before his death.  M. Brennan Depo. at 49-50; Blechman Decl., Ex. H (Deposition of Theodore Joseph Brennan ("T. Brennan Depo.")) at 66.  Decedent would have "episodes" every couple of years that would last for a week or two to a few months during which he would engage in heavy alcohol and marijuana use and behave bizarrely.  M. Brennan Depo. at 98, 100; T. Brennan Depo. at 64, 66.  At one point Decedent became delusional and was committed for mental health issues.  M. Brennan Depo. at 100.  According to Matthew, Decedent had been taking lithium for the past four years, but Matthew does not think that Decedent was taking lithium on the date of the shooting.  *Id.* at 97.  Matthew has also heard family members say that Decedent was an alcoholic.  *Id.* at 84-85.  At the time of the shooting, Theodore thought Decedent was fine and did not believe he was having one of his episodes.  T. Brennan Depo. at 64-65.

### 2.        Encounter Between Decedent and Deputy Jones

On October 27, Deputy Ian Jones was working patrol duty in the City of Oakley.  Joint Statement of Undisputed Material Facts in Support of Motion for Summary Adjudication ("JSUF") #4.  Deputy Jones is a peace officer with the Contra Costa County Sheriff's Office ("CCCSO"), where he has worked since graduating from the police academy in 1995.  JSUF #1.  The CCCSO contracts with cities in the County of Contra Costa, such as the City of Oakley, to provide police services.  JSUF #1.  Prior to joining the CCCSO, Deputy Jones was in the U.S. Marine Corps for two four-year tours of duty, one of which was during the Persian Gulf War where he served as an infantryman sniper in a sniper platoon.  JSUF #3; Blechman Decl., Ex. I (Declaration of Ian Jones in Support of Motion for Summary Adjudication ("Jones Decl.")) ¶ 3.  Deputy Jones was honorably discharged in 1994 at the rank of Sergeant.  Jones Decl. ¶ 3.  Deputy Jones has received extensive training in all areas of law enforcement, including POST training, basic and advanced SWAT training, advanced officers' training, and was formerly a police canine handler.  JSUF #3.  He was formerly a sniper on the Contra Costa County SWAT team and is considered an expert marksman with a pistol as a result of his military and CCCSO experience.  JSUF #3.  Deputy Jones has been a patrol officer since 1999 and was promoted to Corporal in 2007 prior to Decedent's shooting.  JSUF

#2. While in the Marine Corps, Deputy Jones was trained in hand-to-hand combat, and he was also trained in how to subdue a person during arrest in his police training. Declaration of Benjamin Nisenbaum in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Adjudication ("Nisenbaum Decl."), Ex. A (Deposition of Deputy Ian Jones) at 42.

At approximately 11:40 p.m., Deputy Jones parked his police car at the intersection of Live Oak Avenue and Nut Tree Lane in Oakley to monitor traffic and perform speed enforcement. JSUF #4. He was in full police uniform, driving a marked police car, and was with his police canine "Bessi." JSUF #4. After being parked for fifteen to twenty minutes he heard the sound of tires screeching to the north. JSUF #4; Jones Decl. ¶ 6; Nisenbaum Decl., Ex. A at 99. Looking north on Live Oak Avenue, Deputy Jones saw the headlights of a vehicle, the van later determined to be driven by Decedent, driving south toward him at a high rate of speed. JSUF #4. He estimated the speed of the van to be approximately seventy miles per hour; the posted maximum speed limit in the area was forty miles per hour. JSUF #4. As the van passed his patrol car he activated his emergency lights and sirens and began following it to conduct a traffic enforcement stop. JSUF #5. The van did not stop, so Deputy Jones advised dispatch of his pursuit of the van and continued pursuing it southbound on Live Oak Avenue for approximately fifteen to twenty seconds at a distance of approximately half a mile to three quarters of a mile. JSUF #5. Deputy Jones was not able to see the license plate number of the van during the pursuit due to the speed of the van. JSUF #5.

During his pursuit, Deputy Jones believed the van was involved in a collision because he saw its tail lights go up into the air and saw it turn sideways, but he was unable to see anything else because a large cloud of dust was covering the area. JSUF #6. Deputy Jones drove through the cloud of dust and saw a Honda Civic stopped facing northbound in the southbound lane. JSUF #6. The Civic had major rear-end damage leading Deputy Jones to believe that the van had collided with the Civic. JSUF #6. According to Deputy Jones, he did not see the van at the scene of the collision so he continued to drive south to see if the van had driven into the adjoining water canal. Jones Decl. ¶ 13. Deputy Jones did not see the van in the water canal, but saw the tail lights of an

United States District Court

For the Northern District of California

1   unidentified vehicle driving eastbound on Laurel Road.  *Id.* ¶ 14.  Rather than attempt to follow the

2   vehicle on Laurel Road, Deputy Jones returned to the Civic to check on the driver.  *Id.*

3          Raylene Poppino, the driver of the Civic, had been traveling down Live Oak Road when she

4   was struck from behind by the van.  Nisenbaum Decl., Ex. B (Deposition of Raylene Poppino

5   ("Poppino Depo.")) at 11.  Sarah Webster, a friend of Poppino who was driving in front of Poppino,

6   looked in her rear view mirror and saw Poppino's car spinning as a result of the impact.  Nisenbaum

7   Decl., Ex. C (Deposition of Sarah Webster ("Webster Depo.")) at 14.  Neither Poppino nor Webster

8   actually witnessed the van hit Poppino.  Poppino Depo. at 13; Webster Depo. at 16. Webster made a

9   U-turn and drove back to where Poppino's car had stopped to check on her.  Webster Depo at 16.

10  After she was hit, Poppino got out of her car to inspect the damage.  Poppino Depo. at 16.

11         Deputy Jones asserts that when he drove back to where the Civic was parked, the electrical

12  power in his patrol car failed and the car's emergency lights and sirens turned off, although the

13  engine continued to run.  *Id.* ¶ 15.  Deputy Jones states that the car had experienced electrical

14  problems before, at least six months prior, when the lights and sirens had suddenly shut off during a

15  pursuit.  Nisenbaum Decl., Ex. A at 81.  According to Deputy Jones, after parking his patrol car he

16  approached Poppino and asked her if she was okay and if she needed an ambulance and she

17  responded that she was not injured.  *Id.* at 113-14.  Poppino states that she heard a police siren as she

18  was inspecting the damage to her car and then saw a police car parked on the opposite side of the

19  street, but she does not recall having any interaction with a police officer prior to the shooting.

20  Poppino Depo. at 16-17, 33-34.  At deposition, Poppino stated that she has a "horrible memory," and

21  it could be that an officer spoke to her but she does not remember.  *Id.* at 31, 33.  Webster also

22  asserts that she did not have any contact with a police officer prior to the shooting and that she did

23  not see any police officer talk to Poppino prior to the shooting.  Webster Depo. at 27, 65.

24          After requesting an ambulance for Poppino, Deputy Jones walked to the water canal again to

25  make sure the van had not driven into it.  Jones Decl. ¶ 17.  He then saw and heard a Hispanic male

26  yelling "Car! Car!" and pointing toward the front yard of a nearby house located at 4060 Live Oak

27  Avenue.  *Id.*  Deputy Jones walked toward the house, noticed pieces of wood lying on the ground in

28

7

United States District Court
For the Northern District of California

front of the house which appeared to have come from a broken fence, and saw the van in the front yard of the house.  JSUF #7; Jones Decl. ¶ 18-19.  The van had front-end damage on the driver's side consistent with having been in a collision, the front passenger side door of the van was open, the interior lights were on and the engine was running.  JSUF #7; Jones Decl. ¶ 19.  Deputy Jones states that he was holding a flashlight in his right hand at this time.  Jones Decl. ¶ 20.  After visually clearing the van and finding it unoccupied, he radioed dispatch and gave them the license plate number.  JSUF #7, 9; Jones Decl. ¶ 20-22.  Deputy Jones was still the only officer on the scene.  JSUF #8; Jones Decl. ¶ 21.  As Deputy Jones began walking down the driveway toward the house he saw the Hispanic man again standing near the house, speaking Spanish, and pointing toward the backyard of the house.  JSUF #9; Jones Decl. ¶ 23.  Deputy Jones interpreted this to mean that the driver of the van may have run into the backyard.  JSUF #9; Jones Decl. ¶ 23.

According to Deputy Jones, as he approached the house he saw movement to his right, and as he looked to his right he saw Decedent running toward him with a crazed look in his eyes.  Jones Decl. ¶ 24.  Decedent's eyes were wide and there was blood in his mouth, on his tongue, and in between his teeth.  *Id.*  Deputy Jones asserts that Decedent hit him on the right side of the head near the temple and grabbed his front chest area, under his armpits, with both hands.  *Id.* ¶ 25.  Deputy Jones states that he dropped his flashlight when he was attacked by Decedent.  *Id.* ¶ 26.  In order to try to gain a position of advantage over Decedent, Deputy Jones grabbed the front chest area of Decedent's shirt and tried to swing him to the ground.  JSUF #10; Jones Decl. ¶ 27.  Although Decedent did not gain physical control over Deputy Jones, Deputy Jones' initial attempt to take Decedent to the ground was not successful.  Supplemental Declaration of Noah G. Blechman in Support of Defendants' Motion for Summary Adjudication ("Supplemental Blechman Decl."), Ex. P (Deposition of Ian Jones) at 153-54.  As Deputy Jones and Decedent struggled, Deputy Jones yelled, "Get on the ground, get on the ground."  JSUF #10; Jones Decl. ¶ 27.  Deputy Jones claims that in response Decedent yelled in an angry voice, "You're going to have to shoot me.  You're going to have to shoot me."  Jones Decl. ¶ 27.  Deputy Jones does not recall hearing Decedent slurring his speech and did not smell alcohol.  Nisenbaum Decl., Ex. A at 130, 142.

Deputy Jones states that he swung Decedent to the right and they both ran into a nearby parked truck. Jones Decl. ¶ 30. According to Deputy Jones, he then felt Decedent tugging on his firearm with "significant force," "violently pulling on [his] firearm with so much force that [Decedent] was somewhat lifting the left side of [Deputy Jones'] body up." *Id.* ¶ 31. Deputy Jones asserts that he reached down with his left hand, as he is left handed, and could feel both of Decedent's hands on the grip of his holstered firearm. *Id.* The firearm holster Deputy Jones was wearing was equipped with safety mechanisms designed to make it more difficult for anyone other than Deputy Jones to access the firearm. *Id.* ¶ 32. The holster had a thumb strap over the grip of the weapon that must be pushed down and rolled forward, and a thumb button must be pushed to allow the firearm to be unlocked and removed from the holster. *Id.* However, Deputy Jones asserts that significant force could potentially allow unauthorized access to the firearm, and Deputy Jones is aware of holsters that have been ripped off of officers' duty belts. *Id.*

In order to prevent Decedent from gaining control of his firearm, Deputy Jones tried to put enough force on Decedent's hands to keep the firearm in its holster. *Id.* ¶ 33-34. Deputy Jones asserts that at the same time he reached down and activated the remote control opener to open the rear door of his patrol car in order to release his canine Bessi. *Id.* ¶ 35. Although the remote opener had never failed before, it did not work and Bessi was not released. *Id.* ¶ 35; Nisenbaum Decl., Ex. A at 92. However, Deputy Jones speculates that even if Bessi had been released from the patrol car, she would not have been able to assist him during the struggle due to the rapidity of the events and the distance at which his patrol car was parked. Jones Decl. ¶ 54.

Deputy Jones asserts that he then pushed Decedent off and away from him with his right hand in an attempt to get some distance between them and turned his body to the left so that the left side of his body, the firearm side, would be farther away from Decedent. *Id.* ¶ 36. Deputy Jones succeeded in pushing Decedent about two feet away from him and began to unholster his firearm while ordering Decedent to get on the ground. *Id.* ¶ 38. According the Deputy Jones, Decedent did not comply with his orders to get on the ground, so Deputy Jones removed his firearm from its holster to try to get Decedent to comply. Nisenbaum Decl., Ex. A at 143. Decedent continued to

yell, "You're going to have to shoot me, you're going to have to shoot me," or words to that effect,
and rather than complying with Deputy Jones' commands or attempting to flee, Decedent came at
him again. Jones Decl. ¶ 38-39. Decedent grabbed Deputy Jones' shirt, ripping off the front pocket
of Deputy Jones' shirt in the ensuing struggle. *Id.* ¶ 39. Deputy Jones states that he pushed
Decedent away a second time and tried to take a big step backward to get more distance between
him and Decedent. *Id.* ¶ 40. Deputy Jones estimates that this push put about six or seven feet of
distance between him and Decedent. Nisenbaum Decl., Ex. A at 149.

      Deputy Jones had his firearm in his left hand and pointed it up toward Decedent. Jones Decl.
¶ 41. As Decedent came at Deputy Jones again, Deputy Jones shot one round from his firearm at
Decedent "to stop Decedent's violent assault and attack." *Id.* ¶ 42, 46. The bullet struck Decedent in
his left cheek. Blechman Decl., Ex. G (Coroner's Inquest) at 18. Deputy Jones estimates that he
was three to four feet away from Decedent at the time he fired and asserts that he did not have the
time or opportunity to aim his firearm prior to shooting. Jones Decl. ¶ 41-42. Deputy Jones testified
that he was not aiming for any particular point on Decedent, Supplemental Blechman Decl., Ex. Q at
37-38, but also testified that he intended to shoot Decedent in the head rather than in the body
because he was taught to "shoot to stop the threat" and he believed he "needed to stop the threat."
Nisenbaum Decl., Ex. D (Coroner's Inquest) at 50. Deputy Jones describes Decedent's advance as a
"deadly threat" and states, "I was in total fear for my life." Jones Decl. ¶ 42. Deputy Jones
explained, "[H]e came at me on three different occasions. He had the time to go away. And even
when I had my weapon out, he was still coming after me. So it means his intent was to get the
weapon." Nisenbaum Decl., Ex. A at 149. According to Deputy Jones, Decedent had the
opportunity to stop resisting and to flee but instead continued attacking Deputy Jones and did not
appear at any point as though he was going to give up or submit to arrest. Jones Decl. ¶ 50-51.
When Deputy Jones fired his firearm at Decedent he "firmly believed that Decedent was going to
attack [him] again, would perhaps overpower [him] and obtain [his] firearm and shoot [him]." *Id.* ¶
46.

      Deputy Jones estimates that it was approximately ten seconds from the time when Decedent

United States District Court

For the Northern District of California

first attacked him and hit him in the forehead to the time when he fired his gun at Decedent. *Id.* ¶ 52. Deputy Jones is six feet tall and weighed about 190 pounds at the time of the incident and estimates that Decedent was about two inches taller and weighed approximately 230 to 240 pounds. *Id.* ¶ 47. As a result of the altercation, Deputy Jones sustained a small bump on his right forehead area and a scratch on his neck, and the right front pocket of his uniform was ripped. *Id.* ¶ 56; Blechman Decl., Ex. J (photographs of Deputy Jones' injuries and uniform). Throughout the altercation Deputy Jones could not see Decedent's hands, did not know whether Decedent was armed, and did not have a full view of Decedent's body at any time. JSUF #11; Nisenbaum Decl., Ex. A at 124, 143, 148. Further, the altercation took place in a dark area on a gravel driveway. Nisenbaum Decl., Ex. A at 154. Deputy Jones lost his flashlight during the altercation, did not have a Taser because he was not issued one by the department, and had left his baton inside his patrol vehicle in violation of departmental policy. Jones Decl. ¶ 49. However, Deputy Jones states that other force options, such as pepper spray, would have further endangered his safety because of his proximity to Decedent, *id.*, and that he would not have used his baton even if he had it available because Decedent had already escalated the fight by going for his weapon. Nisenbaum Decl., Ex. A at 149.

Poppino and Webster, who were both standing near Poppino's vehicle, could not see the altercation but heard the gunshot. Poppino Depo. at 31; Webster Depo. at 27. At her deposition, Poppino could not remember hearing voices yelling "get down" or "shoot me" prior to hearing the gunshot. Poppino Depo. at 19, 34. However, Poppino acknowledged that she had told officers at the scene that she heard a loud commotion in the yard prior to the gunshot and heard someone yell "get down, get down" several times prior to the gunshot. *Id.* at 41. Poppino states that her memory was clearer during the time immediately after the shooting, and that she believes whatever she said at the scene is correct. *Id.* Similarly, Webster did not remember hearing any commands or the sound of a struggle prior to the gunshot during her deposition. Webster Depo. at 19-20, 31-32. However, Webster acknowledged that she told police at the scene that she heard somebody say "get down, get down" before hearing the gunshot. *Id.* at 32. Webster also states that she believes her

statements at the scene were correct. *Id.*

After shooting Decedent, Deputy Jones backed away and contacted dispatch to request an ambulance. JSUF #12. The first additional officers arrived shortly thereafter, at which time Deputy Jones felt sick and started to vomit "due to the stress of the traumatic near death experience." *Id.* ¶ 44.

Decedent died as a result of a gunshot wound to the head. JSUF #14; Blechman Decl., Ex. G at 17. The medical cause of death was the gunshot wound, and the bullet entry point was the left cheek, just below the eye, with the bullet traveling from Decedent's front to back. JSUF #15. The range of fire was determined to be two feet or more, possibly up to 200 feet. Blechman Decl., Ex. G at 18-19. Decedent's blood alcohol was .16 percent, twice the legal limit for driving. *Id.* at 20-21. Additionally, Decedent's urine tested positive for THC, the byproduct of marijuana, indicating that he had used marijuana at some point prior to the incident. *Id.* at 24. THC in the urine indicates marijuana use occurred at some time as early as several weeks prior to testing up to immediately prior to testing. *Id.*

**B.     The Complaint**

Plaintiffs filed this action on November 26, 2008. They name as Defendants: 1) Deputy Ian Jones; 2) Deputy Mark Johnson; 3) Warren Rupf, in his official capacity as Sheriff for the CCCSO; 4) the County of Contra Costa; 5) the City of Oakley; and 6) Does 1-100.[1]

Plaintiffs assert the following claims in their Complaint:[2]

| Claim One: | **Wrongful Death – Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint ¶¶ 39-40. |
|---|---|
| Claim Two: | **Denial of Right to Familial Relationship – Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint ¶¶ 41-42. |
| Claim Three: | **Excessive Force against Plaintiff Matt Brennan – Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint ¶¶ 43-44. |

---

[1]The Complaint also named as Defendant Chris Thorsen, in his official capacity as Chief of Police for the City of Oakley. On March 19, 2009, Plaintiffs filed a Notice of Dismissal of Defendant Chris Thorson pursuant to Fed. R. Civ. P. 41(a)(1).

[2]In the Complaint, Plaintiffs erroneously labeled the Ninth and Tenth causes of action as the Sixth and Seventh causes of action.

United States District Court

For the Northern District of California

| | |
|---|---|
| <u>Claim Four</u>: | ***Monell* Municipal Liability for Constitutional Violations – Federal Law** (42 U.S.C. § 1983); asserted against Defendants County of Contra Costa and City of Oakley.  Complaint ¶¶ 45-50. |
| <u>Claim Five</u>: | **Excessive Force against Decedent James Brennan – Federal Law** (42 U.S.C. § 1983); asserted against all Defendants.  Complaint ¶¶ 51-54. |
| <u>Claim Six</u>: | **Wrongful Death – State Law** (Cal. Civ. Pro. Code §§ 377.60 & 377.61); asserted against Defendants County of Contra Costa, City of Oakley, Deputy Jones, and Does 1-50.  Complaint ¶¶ 55-59. |
| <u>Claim Seven</u>: | **Violation of California Civil Rights – State Law** (California's Bane Act, Cal. Civ. Code § 52.1); asserted against Defendants County of Contra Costa, City of Oakley, Deputy Jones, Deputy Johnson, and Does 1-50.  Complaint ¶¶ 60-64.. |
| <u>Claim Eight</u>: | **Assault and Battery – State Law** (California common law); asserted against Defendants Deputy Jones, Deputy Johnson, and Does 1-50. Complaint ¶¶ 65-67. |
| <u>Claim Nine</u>: | **Intentional Infliction of Emotional Distress – State Law** (California common law); asserted against Defendants Deputy Jones, Deputy Johnson, and Does 1-50.  Complaint ¶¶ 68-70. |
| <u>Claim Ten</u>: | **Negligent Infliction of Emotional Distress – State Law** (California common law); asserted against Defendants Deputy Jones, Deputy Johnson, and Does 1-50.  Complaint ¶¶ 71-73. |

## C.     The Motion

In the Motion, Defendants seek summary judgment on several grounds.  First, Defendants assert that they are entitled to summary judgment as to Claims One, Four, and Five to the extent that those claims are based on Deputy Jones' actions in relation to the shooting death of Decedent.  In particular, Defendants argue that the wrongful death and excessive force claims fail as a matter of law because the undisputed evidence shows that Deputy Jones' actions were objectively reasonable under the circumstances as required by the Fourth Amendment.

Second, Defendants contend that Claim Two for loss of familial relations fails because there is no evidence that Defendant Jones had a "purpose to harm" Decedent beyond a legitimate law enforcement objective as required to show a violation of Plaintiffs' Fourteenth Amendment substantive due process right of familial association.

Third, Defendants assert that Deputy Jones is entitled to qualified immunity because the law

United States District Court

For the Northern District of California

at the time of his encounter with Decedent did not clearly establish that his conduct would violate Decedent's constitutional rights.  Even if there was a clearly established constitutional right, Defendants assert that Deputy Jones could have reasonably believed that his conduct was lawful.

Fourth, Defendants argue that summary judgment should be entered on all federal claims against the County of Contra Costa and the City of Oakley arising out of Deputy Jones' conduct because Plaintiffs have not offered any evidence of a policy or custom sufficient to give rise to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1987).

Fifth, Defendants contend that they are entitled to summary judgment on all of Plaintiffs' state law claims (Claims Six, Seven, Eight, Nine, and Ten) to the extent that those claims are based on Deputy Jones' actions in relation to the shooting death of Decedent because Deputy Jones' actions were objectively reasonable under the circumstances.  Further, Defendants contend that Deputy Jones, Sheriff Rupf, the County of Contra Costa, and the City of Oakley are entitled to state law immunity for Deputy Jones' actions in relation to the shooting death pursuant to section 820.2 and 815.2 of the California Government Code.

In their Opposition, Plaintiffs oppose summary judgment on all grounds, making the following specific arguments.  First, with respect to Claims One, Four, and Five, Plaintiffs argue that there are material questions of fact that must be determined by a finder of fact, and that a reasonable juror could conclude that Deputy Jones' decision to shoot Decedent constituted excessive force and was unreasonable.

Second, Plaintiffs contend that summary judgment should not be granted on Plaintiffs' claim for loss of familial relations because Deputy Jones' decision to shoot Decedent in the head "shocks the conscience" and therefore violated Plaintiffs' Fourteenth Amendment substantive due process right of familial association.

Third, Plaintiffs argue that Deputy Jones is not entitled to qualified immunity because a reasonable juror could conclude from the evidence that Deputy Jones' decision to use deadly force on Decedent was unreasonable.

Fourth, Plaintiffs assert that summary judgment should not be granted on their *Monell* claims

because Deputy Jones' encounter with Decedent evidences a failure to adequately train officers and/or a failure to admonish officers on the part of the County of Contra Costa and the City of Oakley, amounting to a policy or custom.

Fifth, Plaintiffs argue that Deputy Jones is not entitled to state law immunity because his decision to use deadly force was objectively unreasonable and excessive. As a result, Sheriff Rupf, the County of Contra Costa, and the City of Oakley are also not entitled to state law immunity with respect to Deputy Jones' actions.

### D.   Motion to Strike

Defendants also make various evidentiary objections to statements made by Plaintiffs in their Opposition and bring a motion to strike these statements. Under Federal Rule of Civil Procedure 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, motions to strike under Rule 12 are generally disfavored. *Chiron Corp. v. Abbott Labs.*, 156 F.R.D. 219, 220 (N.D. Cal. 1994). The statements referenced by the motion to strike appear in the Opposition written by Plaintiffs' counsel and are not themselves evidence. Rather, these statements are arguments by Plaintiffs' counsel and are not redundant, immaterial, impertinent, or scandalous. Accordingly, Defendants' Motion to Strike is DENIED.[3]

### E.   Request for Judicial Notice

Defendants request that the Court take judicial notice of 1) California Criminal Jury Instruction No. 2111, and 2) California Vehicle Code section 23152. Request for Judicial Notice in Support of Defendants' Motion for Summary Adjudication at 2. Plaintiffs have not opposed Defendants' request for judicial notice.

---

[3]Additionally, in a footnote in their Opposition, Plaintiffs request that the Court strike all representations and exhibits pertaining to Decedent's behavior prior to his encounter with Deputy Jones. Plaintiffs argue that only information known to Deputy Jones at the time of the shooting is relevant to the Motion. The Court finds the pre-incident behavior to be relevant since it has a tendency to make the events to which Deputy Jones testified more or less probable, Fed. R. Evid. 401, and evidence that may support one version of events over another is relevant and admissible, *see Boyd v. City & County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009). Deputy Jones' assertions that Decedent was acting aggressively and attempting to take his gun are more likely true in light of Decedent's pre-incident behavior. The Court therefore declines to strike Defendants' evidence showing Decedent's pre-incident behavior.

United States District Court

For the Northern District of California

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  The Court finds that the documents at issue meet the requirements of Rule 201.  Accordingly, Defendants' request for judicial notice is GRANTED.

## III.    ANALYSIS

### A.    Legal Standard under Rule 56(c)

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial."  *Celotex*, 477 U.S. at 323.  To establish a "genuine" issue of fact when opposing summary judgment, a plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

### B.    Excessive Force and Wrongful Death under 42 U.S.C. § 1983

Plaintiffs allege that Deputy Jones' use of deadly force against Decedent was unreasonable and excessive.  Defendants argue that they are entitled to summary judgment on Plaintiffs' excessive force and wrongful death claims arising out of the shooting of Decedent because the undisputed evidence shows that Deputy Jones' use of deadly force was objectively reasonable.  The Court

United States District Court

For the Northern District of California

1  agrees that Defendants are entitled to summary judgment on Plaintiffs' claims of wrongful death and

2  excessive force.

3          A claim against a law enforcement officer for excessive force, including the use of deadly

4  force, is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Blanford v.*

5  *Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).  Determining whether the force used was

6  reasonable "requires careful attention to the facts and circumstances of each particular case,

7  including the severity of the crime at issue, whether the suspect poses an immediate threat to the

8  safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

9  arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "The reasonableness of a particular

10  use of force must be judged from the perspective of a reasonable officer on the scene, rather than

11  with the 20/20 vision of hindsight."  *Id.*  Moreover, a court should be mindful of the fact that "police

12  officers are often forced to make split-second judgments - in circumstances that are tense, uncertain,

13  and rapidly evolving - about the amount of force that is necessary in a particular situation."  *Id.* at

14  397.  "Officers thus need not avail themselves of the least intrusive means of responding to an

15  exigent situation; they need only act within that range of conduct we identify as reasonable."  *Scott*

16  *v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992).

17          "A police officer may reasonably use deadly force where he 'has probable cause to believe

18  that the suspect poses a threat of serious physical harm, either to the officer or to others.'"  *Billington*

19  *v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

20  In *Billington*, a suspect fled from a police officer in his vehicle, eventually crashed the vehicle, and

21  the pursing police officer exited his patrol car and approached the wreck to render aid and arrest the

22  suspect.  *Id.* at 1180.  Although other officers were on the way, the pursing officer was the only

23  officer at the scene at the time.  *Id.*  The officer found the suspect in the driver's seat and reached in

24  to turn off the ignition of the vehicle when the suspect grabbed the officer's flashlight, began hitting

25  the officer, and grabbed the officer by his throat.  *Id.* at 1181.  The suspect held onto the officer as

26  the officer tried to back away and yelled at the officer to shoot him.  *Id.*  The officer repeatedly

27  struck the suspect in the head with his flashlight to no effect.  *Id.*  The suspect continued to punch

28

**United States District Court**
For the Northern District of California

1   and kick the officer, charged him, and then grabbed the barrel of the officer's unholstered gun. *Id.*

2   According to the officer, the two men began struggling for the officer's firearm and the officer felt

3   the "slide" move back toward the locked position where it would prevent the gun from firing. *Id.* In

4   fear for his life and not wanting the suspect to disarm his weapon, the officer moved the slide

5   forward and fired, killing the suspect. *Id.* The accounts of witnesses were generally in agreement

6   that the suspect was the aggressor and that he was winning the fight. *Id.* at 1182.

7   The *Billington* court concluded that "[u]nder the circumstances, a reasonable officer would

8   perceive a substantial risk that [the suspect] would seriously injure or kill him, either by beating and

9   kicking him, or by taking his gun and shooting him with it." *Id.* at 1185. Although there was a

10  genuine issue of material fact as to whether the men were grappling over the firearm at the time it

11  was fired, the Ninth Circuit held that the officer's actions were objectively reasonable because the

12  officer "was locked in hand-to-hand combat and losing." *Id.* Specifically, the court relied on the

13  facts that the suspect was "the aggressor," was "actively, violently, and successfully resist[ing] arrest

14  and physically attack[ing]" the officer, and "was getting the upper hand" and concluded that the

15  suspect "posed an imminent threat of injury or death." *Id.*

16  Similarly, in *Day v. County of Contra Costa*, the court concluded that an officer was justified

17  in his use of deadly force during an altercation with a suspect. No. C 07-4335 PJH, 2008 WL

18  4858472 (N.D. Cal. Nov. 10, 2008). There, two officers in a patrol car had followed a suspected

19  stolen vehicle until it stopped in the driveway of a house. *Id.* at *1. As the officers approached the

20  vehicle, they noticed furtive movements by the three occupants of the vehicle, saw that there was no

21  key in the ignition even though the car's engine was idling, and saw glass and a metal tool often

22  used to break windows inside the car. *Id.* When one officer asked the driver to exit the vehicle so

23  that he could pat search him for weapons, the driver began running away and the officer pursued him

24  on foot. *Id.* at *2. The officer chased the suspect over a wall and into a dark area where the officer

25  had to use his flashlight. *Id.* During the pursuit, the officer yelled "Stop! Sheriff's Office! Police!"

26  or words to that effect several times. The officer caught up to the suspect as he attempted to climb

27  over a gate, and as the officer grabbed the suspect, the gate opened and the officer fell to the ground,

28

United States District Court
For the Northern District of California

1   dropping his flashlight. *Id.* at *3. The officer and suspect were in an unlit yard covered in trash and

2   debris, and as the officer attempted to stand up, he was either hit on his head by the suspect or ran

3   into an air conditioning unit sticking out from a nearby window. *Id.* The officer, who had difficulty

4   seeing and could not locate his flashlight, grabbed the suspect to prevent him from fleeing while the

5   suspect punched and swung at the officer. *Id.* In an attempt to stop the assault, the officer pushed

6   the suspect away, but the suspect continued to come at him while aggressively swinging. *Id.* When

7   the officer fell down as a result of the debris in the yard, the suspect moved on top of him and

8   continued to swing. *Id.* As the officer stood up, the suspect continued to come at him aggressively,

9   pushing him backward and punching and hitting the officer. *Id.* at *4. Believing his life was in

10  danger, the officer drew his firearm and fired one shot in the direction of the suspect. *Id.* The

11  officer did not have a Taser and stated that he could not have used a baton or pepper spray because

12  of his proximity to the suspect. *Id.* The entire incident happened very quickly, lasting for less than

13  two minutes from the time the officer initially pulled up to the vehicle to the time the suspect was

14  shot. *Id.* at *14.

15      The district court granted summary judgment in favor of the officer, concluding that the

16  evidence showed that the officer's concern for his own safety justified his use of deadly force and

17  that the officer had probable cause to believe that the suspect posed a threat of serious physical

18  harm. *Id.* *13. The court was persuaded by the fact that the suspect had attempted to flee, engaged

19  in a scuffle with the officer in a dark yard filled with trash and debris, and continued to resist arrest

20  and attack the officer throughout the altercation. *Id.* The amount of injury inflicted on the officer,

21  whether or not the suspect initially hit the officer on the head (or the officer ran into the air

22  conditioning unit), and whether the officer gave a warning before shooting the suspect were found to

23  be "minor considerations in the totality of what transpired in the short amount of time" that the

24  officer pursued and struggled with the suspect in the unlit yard. *Id.* The court found it to be more

25  significant that the officer had no way of knowing whether the suspect was armed, could not clearly

26  see the suspect, and had no way of knowing whether the suspect was trying to kill him. *Id.* *14.

27      The Ninth Circuit has recognized that deadly force poses a particularly difficult problem in

28

19

United States District Court

For the Northern District of California

the context of excessive force cases because the officer is often the only surviving eyewitness. *Scott*, 39 F.3d at 915. Thus, the court "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story - the person shot dead - is unable to testify." *Id.* To do this, the court must "carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* Summary judgment is not appropriate if a reasonable jury could conclude that the decedent did not pose a threat of serious physical harm to the officer or anyone else. *Id.*

Defendants argue that summary judgment should be granted as to Plaintiffs' claims of excessive force and wrongful death arising out of the shooting of Decedent because Deputy Jones' use of force was objectively reasonable. Using the *Graham* factors to evaluate the reasonableness of the force used by Deputy Jones, Defendants contend: 1) Decedent's reckless driving, hit and run of the Civic, and unprovoked attack of Deputy Jones evidence the severity of the crimes at issue; 2) Decedent's unprovoked attack of Deputy Jones, attempt to remove Deputy Jones' gun from its holster, and repeated attacks of Deputy Jones show that Decedent posed an immediate threat to Deputy Jones' safety; and 3) Decedent was actively and violently resisting Deputy Jones' attempt to arrest him. Based on Decedent's amount of resistance, size and physical strength, and attempt to take Deputy Jones' gun, Defendants argue that Deputy Jones had probable cause to believe that Decedent posed a threat of serious injury or death. Plaintiffs counter that it was unreasonable and excessive for Deputy Jones to end the perceived threat posed by Decedent by shooting him in the head. They point to Deputy Jones' extensive training in hand-to-hand combat, his physical conditioning, and the fact that his injuries - a scratch on his neck and a bump on his head - were minor, and argue that deadly force was not warranted under the circumstances. Plaintiffs also minimize the perceived threat posed by Decedent based on the evidence showing Deputy Jones had successfully defended his gun up to the point when he shot Decedent and Decedent never gained the upper hand in the struggle. Finally, Plaintiffs contend that because Deputy Jones failed to use lesser

United States District Court

For the Northern District of California

1   forms of force, a reasonable fact finder could conclude that he unreasonably failed to consider other

2   force options.

3          Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Officer

4   Jones' conduct was objectively reasonable under the circumstances.  Here, as in *Billington*,

5   Decedent was the aggressor in the altercation with Deputy Jones, attempted to forcefully gain

6   control of Deputy Jones' gun, and was actively, violently, and successfully resisting arrest and

7   physically attacking Deputy Jones.  Under the circumstances, a reasonable officer would perceive a

8   substantial risk that Decedent would seriously injure or kill him, either by attacking him or by taking

9   his gun and shooting him with it.  *See Billington*, 292 F.3d at 1185.  The entire encounter occurred in

10  a dark yard on a gravel driveway and lasted about ten seconds, requiring Deputy Jones to make a

11  split-second judgment in tense and uncertain circumstances.  Like in *Day*, Deputy Jones could not

12  clearly see Decedent and had no way of knowing whether Decedent was otherwise armed.  While

13  Decedent was not able to get the upper hand during the struggle, Deputy Jones' testimony is that he

14  was not able to overpower Decedent and feared that Decedent would eventually overpower him and

15  take his gun.  Finally, the only other force option available to Deputy Jones during the struggle,

16  pepper spray, could not effectively be used due to the closeness of the encounter.

17          While it is clear that Deputy Jones intended to shoot Decedent, his testimony at the

18  Coroner's Inquest regarding whether he intended to shoot him in the head is inconsistent.  Deputy

19  Jones first testified that he was not aiming for any particular point on Decedent and later testified

20  that he intended to shoot Decedent in the head.  Additionally, in his declaration, Deputy Jones states

21  that he did not have time to aim his firearm before he shot Decedent.  For summary judgment

22  purposes, the Court assumes that Deputy Jones intended to shoot Decedent in the head.  However,

23  Deputy Jones was not required to use the least intrusive degree of force possible in responding to the

24  exigent situation; he need only show that his use of force was reasonable under the circumstances.

25  *Scott*, 39 F.3d at 915; *see also Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994).

26  Deputy Jones testified that Decedent was forcefully pulling on his weapon with both hands, that he

27  was afraid Decedent was going to overpower and kill him, and that he fired at Decedent's head in

28

United States District Court

For the Northern District of California

1    order to "stop the threat."  Under the circumstances, the Court concludes that Deputy Jones' split-

2    second decision to fire at Decedent's head in order to stop imminent threat of injury or death posed

3    by Decedent was not objectively unreasonable under the circumstances.  Accordingly, the Court

4    GRANTS summary judgment in favor of Defendants on Plaintiffs' excessive force and wrongful

5    death claims based on Deputy Jones' shooting of Decedent.

6              **C.        Denial of Right to Familial Relationship under 42 U.S.C. § 1983**

7              Plaintiffs allege that Deputy Jones' decision to shoot Decedent in the head violated

8    Plaintiffs' Fourteenth Amendment substantive due process right of familial association.  Defendants

9    argue that they are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim

10   because there is no evidence showing that Deputy Jones had the "purpose to harm" required for his

11   conduct to violate Plaintiffs' right of familial association.  The Court agrees that Plaintiffs have not

12   provided evidence to show that Deputy Jones' conduct "shocks the conscience," therefore

13   Defendants are entitled to summary judgment on this claim.

14             The Due Process Clause of the Fourteenth Amendment protects individuals against

15   governmental deprivations of "life, liberty, or property" without due process of law.  U.S. Const.

16   amend. XIV; *see Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972); *see also Mullins v.*

17   *Oregon*, 57 F.3d 789, 795 (9th Cir. 1995).  The Ninth Circuit recognizes that, under the Fourteenth

18   Amendment, a parent has a constitutionally protected liberty interest in the companionship and

19   society of his or her child.  *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) (quoting *Curnow*

20   *v.Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)).  Official conduct is deemed to violate the

21   Fourteenth Amendment's guarantee of substantive due process if it "shocks the conscience."  *Id.* at

22   1137.  The conduct of a state official may shock the conscience if the official acted with "deliberate

23   indifference" to life.  *Id.*  However, "[a]s the very term 'deliberate indifference' implies, the

24   standard is sensibly employed only when actual deliberation is practical."  *County of Sacramento v.*

25   *Lewis*, 523 U.S. 833, 851 (1998).  In a rapidly escalating confrontation, an officer does not have the

26   opportunity for such deliberation.  *Porter*, 546 F.3d at 1137.  As a result, when an officer encounters

27

28

United States District Court

For the Northern District of California

1  fast-paced, life-threatening circumstances presenting competing public safety obligations, the more

2  demanding "purpose to harm" standard applies.  *Id.* at 1139.

3      For Plaintiffs to show that Deputy Jones' shooting of Decedent shocks the conscience under

4  the purpose to harm standard of culpability they must prove that his purpose was "to cause harm

5  unrelated to the legitimate object of arrest."  *Id.* at 1140 (quoting *Lewis*, 523 U.S. at 836).  "More

6  specifically, '[i]t is the intent to inflict force beyond that which is required by a legitimate law

7  enforcement objective that "shocks the conscience" and gives rise to liability under § 1983.'"  *Id.*

8  (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 172 (3d Cir. 1999)).  This heightened standard

9  of fault is deferential to an officer's decision to use force in situations "that escalate so quickly that

10 the officer must make a snap judgment."  *Id.* at 1137.  "[W]here force against a suspect is meant only

11 to 'teach him a lesson' or to 'get even' then '*Lewis* would not shield the officers from liability.'"  *Id.*

12 at 1140 (quoting *Davis*, 190 F.3d at 172-73).  The purpose to harm standard of *Lewis* "contemplates

13 such rare situations where the nature of an officer's deliberate physical contact is such that a

14 reasonable factfinder would conclude the officer intended to harm, terrorize or kill."  *Id.* at 1141

15 (internal quotation marks omitted).

16     Defendants argue that summary judgment should be granted on Plaintiffs' Fourteenth

17 Amendment claim because there is no evidence showing that Deputy Jones harbored an intent to

18 harm Decedent beyond that which was required to effect Decedent's arrest.  Plaintiffs contend that

19 Deputy Jones used deadly force not warranted by the circumstances when he chose to shoot

20 Decedent in the head to end the threat posed by Decedent, and that such conduct "shocks the

21 conscience and appears to be improperly motivated by animus against the decedent not based on any

22 legitimate law enforcement purpose."  Opposition at 17.  However, this Court has already concluded

23 that Deputy Jones' use of deadly force to stop the threat of injury or death posed by Decedent was

24 objectively reasonable under the circumstances.  Plaintiffs have provided no evidence to show that

25 Deputy Jones had the purpose to harm Decedent beyond his reasonable response to the threat of

26 serious physical harm, nor have Plaintiffs provided any evidence showing that Deputy Jones

27 intended to teach Decedent a lesson, get even, or terrorize Decedent.  While it is true that a decision

28

1    to shoot a suspect in the head will almost certainly be lethal, the evidence shows that Deputy Jones'

2    intent was to shoot to stop the threat posed by Decedent.  Therefore, Plaintiffs have not provided

3    sufficient evidence to show that Deputy Jones' conduct shocks the conscience as required by the

4    Fourteenth Amendment.  The Court GRANTS summary judgment in favor of Defendants on

5    Plaintiffs' Fourteenth Amendment claim of denial of the right to a familial relationship.

6        **D.    Qualified Immunity**

7        Defendants contend that even assuming a constitutional violation occurred as a result of

8    Deputy Jones' shooting of Decedent, Deputy Jones is entitled to qualified immunity for his actions

9    because his conduct did not violate clearly established law.  Defendants argue that at the time of the

10   incident "it was not clearly established that shooting a violently aggressive, resistive and intoxicated

11   person, who attempted to forcibly take the officer's weapon, who is potentially winning in a hand-

12   to-hand struggle with the officer and continued to attack the officer instead of fleeing, was

13   unlawful."  Motion at 25.  To the extent that Deputy Jones was mistaken about the lawfulness of his

14   use of force against Decedent, Defendants argue that he is still entitled to qualified immunity

15   because such a mistake was reasonable under the circumstances.  The Court agrees that even if a

16   constitutional violation were found to have occurred, Deputy Jones would be entitled to qualified

17   immunity.

18        **1.    Standard Governing Qualified Immunity**

19       Under the doctrine of qualified immunity, even if a constitutional violation occurred,

20   governmental officials are immune if their conduct "does not violate clearly established statutory or

21   constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

22   U.S. 800, 818 (1982).  To determine whether a defendant is entitled to qualified immunity, courts

23   must first ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts

24   alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194,

25   200 (2001).  If not, the qualified immunity analysis ends here.  *Id.* at 201.  On the other hand, "if a

26   violation could be made out on a favorable view of the parties' submissions, the next sequential step

27

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1   is to ask whether the right was clearly established." *Id*.[4]

2          The inquiry as to this second question must be "particularized." *Id*.  It is not enough that the

3   general rule is established. *Id*.  Rather, "[t]he relevant, dispositive inquiry in determining whether a

4   right is clearly established is whether it would be clear to a reasonable officer that his conduct was

5   unlawful *in the situation he confronted*." *Id*. at 202 (emphasis added).  The Supreme Court has

6   cautioned that courts should afford "deference to the judgment of reasonable officers on the scene"

7   and should not use "20/20 hindsight vision." *Id*. at 205.  Thus, "[e]ven law enforcement officials

8   who 'reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'"

9   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 641

10  (1987)).

11                  **2.      Application of Standard to Facts**

12          As discussed above, the Court finds no constitutional violation on the undisputed facts of this

13  case.  The qualified immunity analysis, therefore, ends at the first step in the analysis.  However,

14  even if Plaintiffs had presented sufficient evidence to show a constitutional violation, the Court

15  would find that Defendants are entitled to qualified immunity.

16          The second question for the Court to address in the qualified immunity analysis is whether

17  the right violated was clearly established at the time Deputy Jones acted.  *Saucier*, 533 U.S. at 201.

18  If the Court finds that the right violated was clearly established, the Court must analyze whether

19  Deputy Jones could have reasonably believed that his conduct did not violate a clearly established

20  constitutional right.  *Id.* at 202.  Under *Garner* and *Graham*, it was clearly established at the time of

21  Decedent's shooting that, in order to use deadly force, an officer must have probable cause to

22  believe that a suspect poses a threat of serious physical harm to themselves or others.  *See Graham*,

23  490 U.S. at 395.  However, it was not clearly established at the time that an officer could not use

24  deadly force against a suspect who attacks a police officer, violently resists arrest, and attempts to

25  take the officer's firearm in order to prevent the suspect from inflicting serious physical harm on the

26  _____

27          [4] In *Pearson v. Callahan*, the Supreme Court clarified that the order of the two-step inquiry is
    not mandatory.  Rather, courts should "exercise their sound discretion in deciding which of the two
28  prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the
    particular case at hand."  --- U.S. ---, 129 S. Ct. 808, 818 (2009).

United States District Court

For the Northern District of California

1    officer.  Rather, this circuit has held that when an officer is locked in hand-to-hand combat with a

2    suspect who is violently resisting arrest and grabbing the officer's gun, the officer is justified in

3    using deadly force to ward off the substantial risk of serious injury or death posed by the suspect.

4    *Billington*, 292 F.3d at 1185.  As a result, even if Deputy Jones' conduct did amount to a

5    constitutional violation, he did not violate clearly established law.  Accordingly, summary judgment

6    in favor Defendants on the issue of qualified immunity for Deputy Jones' shooting of Decedent is

7    GRANTED.

8    **E.    Municipal Liability for Section 1983 Claims**

9    Defendants contend that the County of Contra Costa and the City of Oakley are entitled to

10   summary judgment on Plaintiffs' section 1983 claims arising out of Deputy Jones' conduct because

11   Plaintiffs have not offered any evidence to establish that the alleged constitutional violations by

12   Deputy Jones were conducted pursuant to a policy, custom, or practice as required by *Monell*.  436

13   U.S. 658.  Plaintiffs assert section 1983 claims against the County of Contra Costa and the City of

14   Oakley on the grounds that Deputy Jones engaged in repeated acts of misconduct that were endorsed

15   by high-ranking county and city officials.  Plaintiffs allege that county and city officials' "deliberate

16   indifference, reckless and/or conscious disregard of the misconduct" of Deputy Jones encouraged

17   the misconduct and caused a lack of training which resulted in the deprivation of Plaintiffs'

18   constitutional right to be free from unreasonable search and seizure.  Plaintiffs argue that the County

19   and City's failure to adequately train officers to utilize lesser forms of force and/or failure to

20   admonish officers when they fail to follow departmental policies regarding the use of deadly force

21   "effectively rubber-stamps" behavior that results in constitutional violations.  The Court agrees with

22   Defendants that Plaintiffs' *Monell* claims against the County of Contra Costa and the City of Oakley

23   arising out of Deputy Jones' conduct fail as a matter of law.

24   Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its

25   employees on a theory of respondeat superior. *Id.* at 691.  "Instead, it is when execution of a

26   government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

27   may fairly be said to represent official policy, inflicts the injury that the government as an entity is

28

United States District Court

For the Northern District of California

1    responsible under § 1983." *Id.* at 694.  A plaintiff seeking to establish municipal liability under

2    section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal

3    employee committed the alleged constitutional violation "pursuant to a formal governmental policy

4    or longstanding practice or custom which constitutes the standard operating procedure of the local

5    governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the

6    constitutional violation was an official with "final policy-making authority and that the challenged

7    action itself thus constituted an act of official governmental policy;" or 3) the plaintiff may

8    demonstrate that "an official with final policy-making authority ratified a subordinate's

9    unconstitutional decision or action and the basis for it." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.

10   1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).  A local government

11   may be liable for constitutional violations resulting from the inadequacy of police training, but only

12   where the failure to train amounts to deliberate indifference to the rights of the people with whom

13   the police come into contact.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

14       Here, Plaintiffs have not identified any formal governmental policy or longstanding practice

15   or custom that caused the alleged violations by Deputy Jones, nor have Plaintiffs provided any

16   evidence that the alleged violations were either committed by an individual with policy-making

17   authority or ratified by such an individual.  Further, Plaintiffs have not provided any evidence

18   showing a failure to train Deputy Jones amounting to deliberate indifference to the rights of the

19   persons with whom the police come into contact.  Accordingly, Plaintiffs' *Monell* claims against the

20   County of Contra Costa and the City of Oakley arising out of Deputy Jones' actions fail as a matter

21   of law.  This Court therefore GRANTS summary judgment for the County of Contra Costa and the

22   City of Oakley on Plaintiffs' claims pursuant to 42 U.S.C. § 1983 based on Deputy Jones' conduct.

23       **F.    State Law Claims**

24       Defendants assert that all of Plaintiffs' state law claims fail as a matter of law because

25   Deputy Jones' conduct was in accordance with the Fourth Amendment's objective reasonableness

26   standard.  Defendants further assert that even if the Court were to find a triable issue of material fact

27   with regard to the state law claims, Defendants are entitled to summary judgment on the basis of

28

United States District Court

For the Northern District of California

state law immunity.  Plaintiffs contend that Deputy Jones' decision to use deadly force was objectively unreasonable and excessive and therefore Defendants are not entitled to state law immunity.

### 1.      Wrongful Death

Plaintiffs assert a claim of wrongful death under California law for Decedent's death as a result of Deputy Jones' conduct.  The objective reasonableness standard applied to Fourth Amendment claims also applies to state law wrongful death claims in California.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273-74 (1998).  As described above, the Court has concluded that Deputy Jones' conduct did not amount to an unreasonable use of force under the Fourth Amendment standard.  Accordingly, the Court GRANTS summary judgment in favor of Defendants on Plaintiffs' state law wrongful death claim.

### 2.      California Civil Code Section 52.1

Plaintiffs' excessive force claims form the basis for their claim for violation of California's Bane Act, codified at California Civil Code section 52.1.  The Bane Act allows individuals to sue for damages where any "person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States."  Cal. Civ. Code § 52.1(a) & (b).  As the Court has already concluded that Deputy Jones' force was objectively reasonable under the circumstances, the Court GRANTS summary judgment for Defendants on this parallel state law claim to the extent that it is based on Deputy Jones' shooting of Decedent.

### 3.      Assault and Battery

Plaintiffs' allegations of excessive force also form the basis for their state law assault and battery claims against Deputy Jones.  Under California law, to prevail on a claim for assault and battery, a plaintiff must establish that the officer used excessive force against him.  *Edson*, 63 Cal. App. 4th at 1273.  The Fourth Amendment standard of reasonableness also applies under California law.  *See Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).  As described above, the Court has concluded that Deputy Jones' conduct did not amount to an unreasonable use of force.

United States District Court

For the Northern District of California

1   Accordingly, the Court GRANTS summary judgment for Deputy Jones on the assault and battery

2   claims.

3             **4.    Intentional Infliction of Emotional Distress**

4        Plaintiffs also assert a cause of action for intentional infliction of emotional distress.  Under

5   California law, to prevail on a claim of intentional infliction of emotional distress, Plaintiffs must

6   show: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the

7   probability of causing emotional distress, (3) severe emotional suffering and (4) actual and

8   proximate causation of the emotional distress."  *See, e.g., Cole v. Fair Oaks Fire Dept.*, 43 Cal. 3d

9   148, 155 n.7 (1987).  As described above, the Court has concluded that Deputy Jones' conduct was

10  reasonable, therefore Plaintiffs have not provided evidence to show outrageous conduct by Deputy

11  Jones.  Because there is no issue of material fact with respect to an essential element of Plaintiffs'

12  claim for intentional infliction of emotional distress, the Court GRANTS summary judgment in

13  favor of Deputy Jones on Plaintiffs' claim of intentional infliction of emotional distress.

14            **5.    Negligent Infliction of Emotional Distress**

15       Plaintiffs also allege a claim of negligent infliction of emotion distress.  In order to prevail on

16  a claim for common law negligence against a police officer, Plaintiffs must show that (1) the officer

17  owed Plaintiffs a duty of care; (2) the officer breached the duty by failing "to use such skill,

18  prudence, and diligence as other members of [the] profession commonly possess and exercise"; (3)

19  there was a "proximate causal connection between the [officer's] negligent conduct and the resulting

20  injury" to Plaintiffs; and (4) the officer's negligence resulted in "actual loss or damage" to Plaintiffs.

21  *Harris v. Smith*, 157 Cal. App. 3d 100, 104 (1984).  To prevail on this claim, Plaintiffs must

22  therefore show that Deputy Jones acted unreasonably and that the unreasonable behavior harmed

23  Plaintiffs.  *See Price v. County of San Diego*, 990 F. Supp. 1230, 1245 (S.D. Cal. 1998).  Where a

24  "federal court factually finds that the police officers' conduct was objectively reasonable and grants

25  summary judgment, that decision bars a state negligence action premised upon violation of the same

26  primary right."  *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1181 (E.D. Cal. 2008).  The Court

27  has already found that Deputy Jones' conduct was objectively reasonable and granted summary

28

1   judgment in favor of Defendants on that basis.  Therefore Plaintiffs' negligence action is barred

2   because it is "premised upon the violation of the same primary right" and the Court GRANTS

3   Defendants' request for summary judgment on this cause of action to the extent that it is based on

4   Deputy Jones' conduct.  *Id.*

5                              **6.    State Law Immunity**

6          Defendants also assert that all of Plaintiffs state law claims arising out of Deputy Jones'

7   shooting of Decedent should be dismissed because Defendants are entitled to state law immunity

8   under sections 820.2 and 815.2 of the California Government Code.  The Court has already

9   determined that Plaintiffs' state law claims fail as a matter of law to the extent that they are based on

10  Deputy Jones' encounter with and shooting of Decedent.  Additionally, the Court concludes that

11  Defendants are entitled to state law immunity.

12         Section 820.2 provides that "a public employee is not liable for an injury resulting from his

13  act or omission where the act or omission was the result of the exercise of the discretion vested in

14  him, whether or not such discretion be abused."  Cal. Gov't Code § 820.2.  Section 815.2 likewise

15  provides that a "public entity is not liable for an injury resulting from an act or omission of an

16  employee of the public entity where the employee is immune from liability."  *Id.* § 815.2.  Under

17  California law, a police officer is entitled to immunity under section 820.2 if circumstances

18  reasonably created fear of death or serious bodily harm to the officer or another.  *Martinez v. County*

19  *of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996).  The standard is the same as that used to evaluate

20  the reasonableness of use of force under the Fourth Amendment.  *Id.*  This Court has already

21  determined that Deputy Jones' conduct was reasonable under the Fourth Amendment standard,

22  therefore he is entitled to immunity pursuant to section 820.2.  Accordingly, Deputy Jones' state law

23  immunity supports the Court's entry of summary judgment on Plaintiffs' state law claim arising out

24  of the shooting of Decedent.

25  **IV.    CONCLUSION**

26         For the reasons stated above, Defendants' Motion for Summary Adjudication is GRANTED.

27  The Court dismisses with prejudice the following claims: 1) Claim One as to all Defendants; 2)

28

Claim Two as to all Defendants; 3) Claim Four as to Defendants County of Contra Costa and City of Oakley to the extent that it is based on Deputy Jones' conduct in shooting Decedent; 4) Claims Five and Six as to all Defendants; 5) Claims Seven through Ten as to Defendant Deputy Jones and as to Defendants County of Contra Costa and City of Oakley to the extent that they are based on Deputy Jones' conduct in shooting Decedent.  Additionally, Defendants Motion to Strike is DENIED.

IT IS SO ORDERED.

Dated: April 2, 2010

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California